**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Yeremey Krivoshey (State Bar No. 295032)
Blair E. Reed (State Bar No. 316791)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com
ykrivoshey@bursor.com
breed@bursor.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-Mail: scott@bursor.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MICHAELE DPHREPAULEZZ on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br>v.<br><br>BAYER HEALTHCARE LLC, and ELANCO ANIMAL HEALTH, INC.<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Michaele Dphrepaulezz ("Plaintiff"), individually and on behalf of other similarly situated individuals, alleges the following Class Action Complaint against defendants Bayer Healthcare LLC ("Bayer") and Elanco Animal Health, Inc. ("Elanco") (collectively "Defendants") for manufacturing, making, marketing, and distributing Seresto brand flea and tick collars ("Seresto Collars" or "Products"), upon personal knowledge as to herself and her own acts and upon information and belief – based upon, *inter alia*, the investigation made by her attorneys – as to all other matters, as follows:

**INTRODUCTION**

1. This is a class action on behalf of purchasers of Seresto Collars in the United States. The Products are sold as a flea and tick repellent that prevents fleas and ticks on pets, specifically dogs and cats, by releasing small amounts of pesticides from the collar onto the pets over months at a time. Contrary to representations, Seresto Collars are anything but safe for pets, as they can and have caused pets and their owners to suffer serious injuries. Thus, any benefit of flea or tick prevention that the Products may offer is far outweighed by the consequences to the pet, other pets nearby, to the pet owner, or to others in the immediate vicinity, including family members.




2. Seresto Collars are marketed as a part of a pet's regular health regimen as flea and tick prevention for dogs and cats. All of the Products' packaging includes representations that lead reasonable consumers to believe that the Products will be safe for their pets and themselves as the

Product's sole purpose is to keep pets safe from fleas and ticks. As shown above, the packaging represents that the Product "Kills and Repels Fleas and Ticks" and offers "8 Month Protection".

3. However, as evidenced by the below photo, Seresto Collars' packaging does not include any mention or warning of the serious risks posed by the Products to the pet wearing the collar, to other pets nearby, to the pet owner, or to others in the immediate vicinity, including family members, including risk of irritation, rashes, hair loss, gastrointestinal problems, seizures, and even death:




4. Similarly, Defendants' marketing of Seresto Collars fails to disclose the serious risks posed by the Products to the pet wearing the collar, to other pets nearby, to the pet owner, or to others in the immediate vicinity, including family members, including risk of irritation, rashes, hair loss, gastrointestinal problems, seizures, and even death. No reasonable consumer would purchase the Products if the risks were noted on the packaging or other advertising.

5. Seresto Collars have been the subject of numerous incidents. According to a report published by USA Today on March 2, 2021 based on documents from the Environmental Protection

Agency ("EPA"), Seresto Collars have been involved in 75,000 incident reports and at least 1,698 pet deaths.[1] Of the 75,000 incidents, nearly 1,000 involved human harm. Even a former EPA staffer reported that she had "never seen any product that had 75,000 incidents[.]"

6. Compared to similar flea and tick collars, Seresto Collars have received an alarming number of incident reports:




7. The high number of incidents is likely related to the synergistic effect of the two pesticides contained in Seresto Collars: imidacloprid and flumethrin.

8. **Imidacloprid** belongs to the neonicotinoid class of insecticides, which are the most commonly used insecticides on crops in the U.S. Despite neonicotinoids being connected to massive die-offs of non-target insects such as bees and butterflies, the EPA proposed re-approving imidacloprid and other class members last year. The pesticide is banned in the European Union for outdoor use but allowed in pet collars. There is also growing evidence that mammals can be harmed by these pesticides as well.

9. **Flumethrin**, EPA documents show, is only an active ingredient in one product: Seresto Collars.

10. The inert or inactive ingredients in the Products, in combination with Flumethrin and Imidacloprid may also trigger reactions and/or serious injury.

[1] The report can be accessed at https://www.usatoday.com/story/news/investigations/2021/03/02/seresto-dog-cat-collars-found-harm-pets-humans-epa-records-show/4574753001/ (last visited April 1, 2021).

11. Under the Federal Insecticide, Fungicide and Rodenticide Act, the EPA must determine a pesticide product will not cause "unreasonable effects on the environment." This determination requires weighing harms versus benefits, including assessments of risks to human health and the environment.

12. Like with most pesticides, the data supporting the registration of Seresto Collars was conducted by the company that produced it, Bayer. The majority of the studies were looking at each pesticide individually. However, a 2012 Bayer study found they have a "synergistic effect," meaning they are **more toxic together** on fleas. The study found that the "unique pharmacological synergism" works as quickly as six hours to prevent ticks from attaching and feeding, preventing disease transmission.

13. Additionally, eight companion animal safety studies were conducted by Bayer looking at the effect of Seresto Collars on domestic cats and dogs. The EPA used these studies to approve Seresto Collars on March 16, 2012. Despite the EPA approval, the California Department of Pesticide Regulation reportedly took issue with the validity of two of the studies but approved the collars anyway.

14. This is not the first time flea and tick collars have been scrutinized. The EPA has previously approved pesticides in flea and tick collars that have been linked to health issues. For example, in April 2016, pesticide companies voluntarily agreed to stop using propoxur, another pesticide linked to cancer and brain development problems to help protect children's health, in their flea and tick collars and switched to a different ingredient. In addition, in 2010, the EPA increased label requirements and limited some inert ingredients in spot-on treatments, which are applied to a specific area of a pet after data showed the treatments were causing hundreds of pet deaths, as well as issues such as irritation, rashes and hair loss, gastrointestinal problems and seizures.

15. Unfortunately for consumers and their pets, use of the Products is not safe. The Products expose pets to a range of injuries and side effects including, but not limited to, dermal symptoms, such as a rash or hives, neurological symptoms, including numbness, seizures and headaches, and even in some cases, death.

16. Even more alarming, the incidents were not limited to pets. Incidents listed by the EPA included:

a. A 12-year-old boy who slept in a bed with a dog wearing a collar started having seizures and vomiting and had to be hospitalized;

b. A 67-year-old woman who slept in a bed with a dog wearing a collar reported having heart arrhythmia and fatigue; and

c. A 43-year-old man put collars on eight dogs and slept in the same bed as four of the dogs. A week later, he developed ear drainage and nasal and throat irritation and was told by a doctor that he had a hole in his ear drum. He removed the dog collars and the symptoms went away. He later reapplied the collars and the symptoms returned.

17. Pet owners have complained that their pets have suffered as a result of using the Products on Amazon, where Seresto Collars are sold. Just a few examples quickly highlight how unsafe and unfit for use the Seresto Collars are:

**STAY AWAY FROM SERESTO COLLAR.**

Reviewed in the United States on March 12, 2020

**Verified Purchase**

People are rite. My little dog started having seizures so I was told she needs an MRI. I spent $3,300 to have one done and found out parts of her brain are completely gone. I have posted a picture of her MRI so everyone can see for there self. All the white spots except for the two round spots in the middle are missing brain. Since I took off the collar she has had no seizures at all. I did wash her with dawn dish soap to remove any residue from her skin as well. Stay away from these collars. I have spent $22,000 in vet bills so far. I would take this very serious. That's why I added my little ones MRI so you can see the damage this stupid collar has caused.





SRsage

**Toxic Collar will put your pet down for good**

Reviewed in the United States on July 23, 2018

**Verified Purchase**

I was not aware the multitude of issues that older dogs have with these collars. Apparently it's a wide known issue if you Google it, but these collars contain a toxin that will kill fleas and dogs alike. We had to take our 12 year old Maltese to the Vet twice now because of this collar. Use Frontline, or another product over a Seresto Collar.



DC

**TOXIC to my small dog**

Reviewed in the United States on October 14, 2018

Verified Purchase

Buyer beware!!! We have used these for our larger dogs with moderate success and no adverse reactions. So we decided to order the small dog version.... BEWARE!!! Days afterwards our dog started behaving oddly not wanting to listen (we thought), not moving when asked and within 4-7 days his back legs started skipping out from under him, he had a hunched bag, difficulty urinating and started coughing up some white foam. We've taken the collar off and although he still is moving slowly, it's faster than before, all bowel and urinary episodes seem to be controlled and he's back to being alert. NEVER again, wish I could get back the $60 we paid. But I'm just glad I caught the symptoms and started doing some research on adverse side effects.



sarah warda

**ALMOST KILLED MY DOG - DO NOT BUY!!**

Reviewed in the United States on May 15, 2020

Verified Purchase

I only wish I had done more research and read reviews before I purchased. After wearing the collar for 10 days, my dog suddenly began twitching and convulsing, became very disoriented and erratic, and kept leaning his head back and waving it slowly side to side. He could barely walk and his tongue moved oddly like had suffered a stroke. Thankfully I was present for his traumatic neurological episode and brought him to an animal hospital immediately. The only thing that has recently changed in his routine was the Soresto collar, his first time wearing one. I started doing research, and discovered thousands have reported seizures and even death from the use of these collars. I removed the collar immediately in his condition improved. Within hours he was able to walk again, after 24 hours he finally ate and drink water, and after 48 hours was able to close his eyes fully and sleep, which he hadn't done since the episode. Read the reviews, this is NOT a safe product.

18. While this damage may not be immediately noticeable, and does not manifest every time the Products are used, the Products nonetheless expose every pet, other pets nearby, the pet owner, or to others in the immediate vicinity, including family members when they are used to a considerable risk of a serious adverse reaction and illness. Simply put, the Products are not fit to be sold as a flea and tick medication and Defendants' omitted any warning to the contrary.

19. Beyond the obvious harm to pets and their owners, the harm to consumers is also substantial. Consumers have been economically injured through purchasing an unreasonably dangerous product that does not perform as advertised. Unwitting consumers, including Plaintiff and Class Members, did not receive the benefit of their bargain when purchasing the Products. Furthermore, most, if not all, pet owners prioritize safety for themselves and their pets. Thus,

knowing the risks associated with the Products is material to Class Members, and they would not have purchased the Products under the same terms had they known the truth.

20. Like most companies, Defendants presumably care about their reputation and regularly monitor on-line consumer reviews because they provide valuable data regarding quality control issues, customer satisfaction, and marketing analytics. Reviews like those copied above would be particularly attention-grabbing for Defendants' management because extreme reviews are sometimes the result of extreme problems, and – just like any other company – Defendants are presumably sensitive to the reputational impact of negative online reviews. Hence, Defendants' management knew or should have known about the above-referenced consumer complaints shortly after each complaint was posted online. Defendants likewise should have been aware of issues through EPA incident reports, the history of banning certain flea and tick collars, and other media reports.

21. Despite being aware of the various issues with Seresto Collars through EPA reports, the history of banning certain flea and tick collars, media reports, and consumer complaints, Defendants continue to deny wrongdoing and deny the fact that the Products pose serious safety risks to consumers and their pets. In 2020, and despite the countless notices that the Products were unsafe, Bayer sold the Seresto brand and other products to Elanco upwards of $7 million dollars. Defendant Bayer knew, or otherwise should have known, about the serious risks posed by Seresto Collars prior to its sale of the Seresto brand to Elanco and thus had a duty to disclose this information to Elanco. in August 2020. Likewise, Defendant Elanco knew or should have known of these issues prior to the purchase in August 2020 because it had an obligation to conduct due diligence. Thus, Defendants put profit ahead of pet owners' and their pets' safety when deciding to sell the Products.

22. This is a proposed class action brought by Plaintiff, on behalf of a class of similarly situated individuals, against Defendants for breach of implied warranty, unjust enrichment, and violations of California consumer protection laws.

//

//

## TOLLING OF THE STATUTE OF LIMITATIONS

23. Any applicable statute of limitations has been tolled by the deceptive conduct alleged herein. Through no fault or lack of diligence, Plaintiff and Class members were deceived regarding the risks with the Products and could not reasonably discover the risks on their own.

24. Plaintiff and Class members could not reasonably discover Defendants' deception with respect to the Products prior to experiencing the risks or being informed of the risks. Within the time period of any applicable statute of limitations, Plaintiff and Class members could not have discovered through the exercise of reasonable diligence that Defendants were concealing the risks associated with the Products.

25. Plaintiff and Class members did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendants were concealing a that the Products were unsafe. As alleged herein, the existence of the safety risk were material to Plaintiff and Class members at all relevant times.

26. At all times, Defendants are and were under a continuous duty to disclose to Plaintiffs and Class members the true standard, quality, and safety of the Products at issue and to disclose any potential safety risk associated with the Products.

27. Defendants knowingly, actively, and affirmatively concealed the facts alleged herein. Plaintiff and Class members reasonably relied on Defendants' knowing, active, and affirmative concealment.

28. For these reasons, all applicable statute of limitations have been tolled based on the discovery rule and Defendants' fraudulent concealment and Defendants are estopped from relying on any statutes of limitations in defense of this action.

## JURISDICTION AND VENUE

29. This Court has personal jurisdiction over Defendants. Defendants purposefully availed themselves of the California consumer market and distribute the Products to at least hundreds of locations within this County and thousands of retail locations throughout California,

where the Products are purchased by thousands of consumers every week.

30. This Court has original subject-matter jurisdiction over this proposed class action pursuant to 28 U.S.C. § 1332(d), which, under the provisions of the Class Action Fairness Act ("CAFA"), explicitly provides for the original jurisdiction of the federal courts in any class action in which at least 100 members are in the proposed plaintiff class, any member of the plaintiff class is a citizen of a State different from any defendant, and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs. Plaintiff alleges that the total claims of individual members of the proposed Class (as defined herein) are well in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs.

31. Venue is proper in this District under 28 U.S.C. § 1391(a). Substantial acts in furtherance of the alleged improper conduct, including the dissemination of false and misleading information and/or omissions regarding the Products, occurred within this District.

## PARTIES

32. **Plaintiff Michaele Dphrepaulezz** is an individual consumer who, at all times material hereto, was a citizen of California. Plaintiff purchased a Seresto Collar for her dog in or around September 2020 in Arcata, California. In purchasing the Product, Plaintiff relied on Defendants' false, misleading, and deceptive marketing of the Products as a safe flea and tick medication. The safety of pet products was and is material to Plaintiff. Plaintiff read and followed the instructions of the Product when applying it to her dog. After application, Plaintiff's one and a half year old service dog became extremely lethargic. Plaintiff removed the collar and the dog recovered.

33. Had Defendants disclosed that the Products are not fit to be used as a flea and tick medication because they are unsafe and pose serious safety risks associated with Seresto Collars, including significant hair loss, welts, itching, and, Plaintiff would not have purchased the Product. In all reasonable probability, she would not have agreed to purchase one of the Products, or would have sought materially different terms, had she known that the truth. Defendants'

misrepresentations and omissions were substantial factors in Plaintiff 's decision to purchase the Product.

34. As a result, Plaintiff experienced financial loss when purchasing the Products because they did not perform as advertised. She did not receive the Products she intended to purchase: flea and tick collars which were fit for their ordinary purpose—the safe administration of flea and tick preventatives to her dogs. Therefore, she did not receive the benefit of her bargain.

35. Plaintiff remains interested in purchasing a safe flea and tick repellant and would consider the Products in the future if Defendants provided a product that would not cause serious side effects and that was safe.

36. **Defendant Bayer Healthcare LLC** is the former owner of the Seresto brand of collars, and sold the brand to Defendant Elanco Animal Health, Inc. in 2020. Bayer is a Delaware corporation and is headquartered in Whippany, New Jersey.

37. **Defendant Elanco Animal Health, Inc.** is the current owner of the Seresto brand. Elanco is an Indiana corporation and is headquartered in Greenfield, Indiana. Since purchasing the Seresto brand in 2020, Elanco has sold the Products at issue.

## CLASS ALLEGATIONS

38. Plaintiff seeks to represent a class defined as all persons in the United States who purchased the Products (the "Class"). Excluded from the Class are persons who made such purchases for purpose of resale.

39. Plaintiff also seeks to represent a Subclass of all Class Members who purchased the Products in California (the "California Subclass").

40. At this time, Plaintiff does not know the exact number of members of the Class and California Subclass; however, given the nature of the claims and the number of retail stores in the United States selling the Products, Plaintiff believes that Class and California Subclass members are so numerous that joinder of all members is impracticable.

41. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

a. whether Defendants misrepresented and/or failed to disclose material facts concerning the Products;

b. whether Defendants' conduct was unfair and/or deceptive;

c. whether Defendants have been unjustly enriched as a result of the unlawful, fraudulent, and unfair conduct alleged in this Complaint such that it would be inequitable for Defendants to retain the benefits conferred upon Defendants by Plaintiff and the Class;

d. whether Defendants breached implied warranties to Plaintiff and the Class; and

e. whether Plaintiff and the Class have sustained damages with respect to the common-law claims asserted, and if so, the proper measure of their damages.

42. Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, purchased, in a typical consumer setting, Defendants' product and Plaintiff sustained damages from Defendants' wrongful conduct.

43. Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel that is experienced in litigating complex class actions. Plaintiff has no interests which conflict with those of the Class or the California Subclass.

44. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

45. The prerequisites to maintaining a class action for equitable relief are met as Defendants have acted or refused to act on grounds generally applicable to the Class and the California Subclass, thereby making appropriate equitable relief with respect to the Class and the California Subclass as a whole.

46. The prosecution of separate actions by members of the Class and the California Subclass would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendants. For example, one court might enjoin Defendants from performing the challenged acts, whereas another might not. Additionally, individual actions could be dispositive of the interests of the Class and the California Subclass even where certain Class members are not parties to such actions.

**COUNT I**
**Violation of the California's Consumers Legal Remedies Act**
**(Injunctive Relief Only)**

47. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

48. Plaintiff brings this cause of action on behalf of herself and members of the California Subclass.

49. This cause of action is brought pursuant to California's Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750-1785 (the "CLRA").

50. Plaintiff and the other members of the California Subclass are "consumers," as the term is defined by California Civil Code § 1761(d), because they bought the Products for personal, family, or household purposes.

51. Plaintiff, and the other members of the California Subclass, and Defendants have engaged in "transactions," as that term is defined by California Civil Code § 1761(e).

52. The conduct alleged in this Complaint constitutes unfair methods of competition and unfair and deceptive acts and practices for the purpose of the CLRA, and the conduct was undertaken by Defendants in transactions intended to result in, and which did result in, the sale of goods to consumers.

53. As alleged more fully above, Defendants have violated the CLRA by marketing the Products as a flea and tick medication but failing to inform consumers that it is not fit to be used as a flea and tick medication for domestic animals because it poses serious safety risks including, but not limited to, significant hair loss, welts, itching, neurological symptoms, and even death.

54. Defendants' unfair or deceptive acts or practices occurred repeatedly in Defendants' trade or business and were capable of deceiving a substantial portion of the purchasing public.

55. Defendants knew that the Seresto Collars were unsafe and posed serious, continuous safety risks to consumers and their pets.

56. Defendants were under a duty to Plaintiff and the Class Members to disclose that the Seresto Collars were, in fact, unsafe because: (a) Defendants were in a superior position to know the true state of facts about the unsafe quality of the Seresto Collars; (b) Plaintiff and Class Members could not reasonable have been expected to learn or discover that the Seresto Collars were unsafe; (c) Defendants knew that Plaintiff and Class Members could not reasonably have been expected to learn or discover the unsafe quality of the Seresto Collars, except by suffering injury from the Products' use; and (d) Defendants actively concealed from the consuming public and failed to disclose the unsafe quality of the Seresto Collars.

57. In failing to disclose the serious safety risks posed by the Seresto Collars at the time of sale, Defendants have knowingly and intentionally concealed material facts and breached their duty not to do so.

58. As a result of engaging in such conduct, Defendants have violated California Civil Code § 1770(a)(5), (a)(7), and (a)(9).

59. Plaintiff and the members of the California Subclass have suffered harm as a result of these violations of the CLRA because they have paid monies for Products that they otherwise would not have incurred or paid.

60. On April 2, 2021, CLRA demand letters were sent to Defendants via certified mail that provided notice of Defendants' violation of the CLRA and demanded that within thirty (30) days from that date, Defendants correct, repair, replace or other rectify the unlawful, unfair, false and/or deceptive practices complained of herein. The letters also stated that if Defendants refused to do so, a complaint seeking damages in accordance with the CLRA would be filed.

61. Pursuant to Cal. Civ. Code § 1780, Plaintiff seeks injunctive relief, reasonable attorneys' fees and costs, and any other relief that the Court deems proper on behalf of Class Members.

**COUNT II**
**Violation of California's Unfair Competition Law**

62. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

63. Plaintiff brings this cause of action on behalf of herself and members of the California Subclass.

64. By committing the acts and practices alleged herein, Defendants have violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17210, as to the California Subclass, by engaging in unlawful, fraudulent, and unfair conduct.

65. Defendants have violated the UCL's proscription against engaging in *unlawful* conduct as a result of its violations of the CLRA, Cal. Civ. Code § 1770(a)(5), (a)(7), and (a)(9) as alleged above.

66. Defendants' acts and practices described above also violate the UCL's proscription against engaging in fraudulent conduct.

67. As more fully described above, Defendants' misleading marketing, advertising, packaging, and labeling of the Products is likely to deceive reasonable consumers.

68. Defendants' acts and practices described above also violate the UCL's proscription against engaging in *unfair* conduct.

69. Plaintiff and the other California Subclass members suffered a substantial injury by virtue of buying the Products that they would not have purchased absent Defendants' unlawful, fraudulent, and unfair marketing, advertising, packaging, and labeling or by virtue of paying an excessive premium price for the unlawfully, fraudulently, and unfairly marketed, advertised, packaged, and labeled product.

70. There is no benefit to consumers or competition from deceptively marketing and labeling the Products.

71. Plaintiff and the other California Subclass members had no way of reasonably knowing that the Products they purchased were not as marketed, advertised, packaged, or labeled. Thus, they could not have reasonably avoided the injury each of them suffered.

72. The gravity of the consequences of Defendants' conduct as described above outweighs any justification, motive, or reason therefore, particularly considering the available legal alternatives which exist in the marketplace, and such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiff and the other members of the California Subclass.

73. Defendants' violations of the UCL continue to this day.

74. Pursuant to California Business and Professional Code § 17203, Plaintiff and the California Subclass seek an order of this Court that includes, but is not limited to, an order requiring Defendants to:

(a) provide restitution to Plaintiff and the other California Subclass members;

(b) disgorge all revenues obtained as a result of violations of the UCL; and

(c) pay Plaintiff and the California Subclass' attorney's fees and costs.

**COUNT III**
**Unjust Enrichment**

74. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

75. Plaintiff brings this claim individually and on behalf of members of the Class and California Subclass against Defendants.

76. Plaintiff and Class members conferred benefits on Defendants by purchasing the Products.

77. Defendants have knowledge of such benefits.

78. Defendants have been unjustly enriched in retaining the revenues derived from Plaintiff's and Class members' purchases of the Products. Retention of those monies under these circumstances is unjust and inequitable because Defendants failed to disclose that the Products are unsafe.

79. Because Defendants' retention of the non-gratuitous benefits conferred on it by Plaintiff and Class members is unjust and inequitable, Defendants must pay restitution to Plaintiff and the Class members for their unjust enrichment, as ordered by the Court.

**COUNT IV**
**Breach of the Implied Warranty of Merchantability**

80. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

81. Plaintiff brings this claim individually and on behalf of members of the Class and California Subclass against Defendants.

82. Defendants, as the designers, manufacturers, marketers, distributors, and/or sellers, impliedly warranted that that the Products are merchantable as flea and tick medication.

83. Defendants breached the warranty implied in the contract for the sale of the Products because they could not "pass without objection in the trade under the contract description," the goods were not "of fair average quality within the description," the goods were not "adequately contained, packaged, and labeled as the agreement may require," and the goods did not "conform to the promise or affirmations of fact made on the container or label." *See* U.C.C. § 2-314(2) (listing requirements for merchantability). As a result, Plaintiff and Class members did not receive the goods as impliedly warranted by Defendants to be merchantable.

84. Plaintiff and Class members purchased the Products relying on Defendants' skill and judgment in properly packaging and labeling Products.

85. The Products were not altered by Plaintiff or Class members.

86. The Products were defective when they left the exclusive control of Defendants.

87. Defendants knew that the Products would be purchased and used without additional testing by Plaintiff and Class members.

88. The Products were defectively designed and unfit for their intended purpose and Plaintiff and Class members did not receive the goods as warranted.

89. As a direct and proximate cause of Defendants' breach of the implied warranty, Plaintiff and Class members have been injured and harmed because they would not have purchased

the Products if they knew the truth about the product and that the product they received was worth substantially less than the product they were promised and expected.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment on behalf of herself and members of the Class and California Subclass as follows:

A. For an order certifying the Class and the California Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and California Subclass and Plaintiff's attorneys as Class Counsel to represent the Class and California Subclass members;

B. For an order declaring that Defendants' conduct violates the statutes referenced herein;

C. For an order finding in favor of Plaintiff, the Class, and the California Subclass on all counts asserted herein;

D. For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

E. For injunctive relief enjoining the illegal acts detailed herein;

F. For prejudgment interest on all amounts awarded;

G. For an order of restitution and all other forms of equitable monetary relief;

H. For an order awarding Plaintiff and the Class and California Subclass their reasonable attorneys' fees and expenses and costs of suit.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all claims so triable.

Dated: April 5, 2021

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Yeremey Krivoshey*
Yeremey Krivoshey

L. Timothy Fisher (State Bar No. 191626)
Yeremey Krivoshey (State Bar No. 295032)
Blair E. Reed (State Bar No. 316791)
1990 North California Blvd., Suite 940

Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com
ykrivoshey@bursor.com
breed@bursor.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-Mail: scott@bursor.com

*Counsel for Plaintiff*